**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Loretta Short,

    Plaintiff,

v.

Louis DeJoy,

    Defendant.

No. CV-20-08267-PCT-DWL

**ORDER**

  Plaintiff Loretta Short ("Plaintiff") began working for the United States Postal Service ("USPS") in 1998, and by 2015 she had become the Postmaster of the Holbrook Post Office.  Plaintiff alleges that after her promotion she began to receive unfavorable treatment due to her race and gender, which prompted her to file a complaint with the agency's Equal Employment Opportunity ("EEO") counselor.  According to Plaintiff, this complaint triggered various retaliatory acts by USPS officials, including her immediate supervisor, Brandi Stoner.[1]  Plaintiff brought suit against Louis DeJoy, Postmaster General of the USPS ("Defendant"), alleging unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964.  Plaintiff's retaliation claim, not her discrimination complaint, is the sole claim before the Court.

  Now pending before the Court is Defendant's motion for summary judgment.  (Doc. 24.)  For the following reasons, the motion is granted.

---

[1] The parties also refer to Brandi Stoner as Brandi Smith, POOM Smith, and POOM Stoner.  For sake of clarity, the Court refers to her simply as "Stoner."

**BACKGROUND**

The background facts below are taken from the parties' summary judgment submissions and are uncontroverted unless otherwise noted. Additional facts bearing on the parties' specific summary judgment arguments are addressed in the Discussion portion of this order.

I.   Factual History

Plaintiff is a Hispanic female. (Doc. 29-2 at 1.) In 2017, Plaintiff was a Level 18 Postmaster[2] in Holbrook, Arizona. (Doc. 24-2 at 7; Doc. 24-3 at 2; Doc. 27-10 at 10.) Stoner was Plaintiff's manager and direct supervisor. (Doc. 24-4 at 2.)

A.   **Plaintiff's Absence On December 26, 2017 And Resulting Investigation**

In early December 2017, Plaintiff expressed her intent to take annual leave on December 26, 2017. (Doc. 24-5 ¶ 5; Doc. 24-6 at 2-5.) Stoner asked about Plaintiff's plan to provide coverage at the Holbrook Office during that time, found the coverage plan to be inadequate, and denied Plaintiff's leave request. (Doc. 24-2 at 10-17; Doc. 24-5 ¶¶ 6-7; Doc. 24-6; Doc. 24-7; Doc. 24-8; Doc. 24-9 at 9-11; Doc. 25 ¶¶ 9-10.) Plaintiff objected because she maintained that, as Postmaster, she could approve her own leave. (Doc. 24-2 at 8-9; Doc. 24-10 ¶ 9.)

On December 22, 2017, Stoner and Human Resources Manager Lerene Wiley ("Wiley") met telephonically with Plaintiff and discussed Stoner's authority to disapprove leave requests if Stoner determined that the requested leave would adversely impact the operational needs of USPS. (Doc. 24-5 ¶ 9; Doc. 25-1 at 7-15.) Stoner ultimately issued Plaintiff a "direct order" to report to work on December 26, 2017. (Doc. 24-5 ¶ 9.) Plaintiff orally acknowledged the order but stated she would report to work "unless [she was] sick"

---

[2]    Plaintiff, as a Postmaster, was an "EAS" or "non-craft" employee. (Doc. 25 ¶ 13.) "A U.S.P.S. employee's salary and duties are governed by a schedule of numbered grade levels. For salaried management employees, the schedule is called the "Executive and Administration Schedule." In U.S.P.S. parlance, EAS-[18] means that the position is at grade [18] of the Executive and Administration Schedule with salary and duties that correspond to that grade." *Holmes v. Potter*, 384 F.3d 356, 357 n.1 (7th Cir. 2004). "[C]raft positions, including mail handler, clerk, and material handler, are unionized, while non-craft positions are generally supervisory or management jobs at higher grade levels." *Beckman v. USPS*, 79 F. Supp. 2d 394, 396 (S.D.N.Y. 2000).

- 2 -

or "as long as it was safe."  (Doc. 24-2 at 14; Doc. 24-5 ¶ 9.)  In response, Stoner instructed Plaintiff to call the sick leave phone number and provide a medical note if she was sick that day.  (Doc. 24-5 ¶ 9.)

On December 26, 2017, Plaintiff called in sick.  (*Id.* ¶ 11.)  An investigation ensued, prompted by alleged failures at the Holbrook Office on that day.  (Doc. 24-5 ¶¶ 12-15.)

During the investigation, Stoner concluded that Plaintiff had: (1) failed to update the posted weekly schedule to reflect she would not be on annual leave on December 26, 2017; (2) left in place the coverage plan that Stoner had rejected; (3) drove to the home of Melanie Greymountain on December 23, 2017 and gave Greymountain the keys to open the office on December 26; (4) had Greymountain complete a change-of-schedule form reflecting she would act in Plaintiff's stead on December 26, 2017; and (5) directed Greymountain to make sure to report to work on December 26, 2017.  (Doc. 24-5 ¶ 10-15; Doc. 24-9 at 22-26; Doc. 25-3 at 3; Doc. 25-4 at 3-4.)

On December 27, 2017, Stoner placed Plaintiff on administrative leave (with pay) pending further investigation and ordered her to report to a fact-finding interview on December 28, 2017.  (Doc. 24-2 at 28; Doc. 24-9 at 34.)  Stoner also instructed Plaintiff not to access the Holbrook Office during the investigation.  (Doc. 25-3 at 6.)  Nevertheless, that evening, Plaintiff contacted subordinate employees about the investigation.  (Doc. 24-5 ¶ 16.)

On December 28, 2017, after the first fact-finding interview, Stoner reassigned Plaintiff to work at the Flagstaff Post Office pending further investigation, effective December 29, 2017.  (Doc. 24-5 ¶ 17; Doc. 25-6 at 16.)  Plaintiff then informed Stoner that her "kids had numerous doctors' appointments and that [she] needed to be off to take sick leave."  (Doc. 29-2 ¶ 23.)  Stoner rejected the request but allowed Plaintiff to "use the 29th as a day off" and start work in Flagstaff on January 3, 2018.  (*Id.*)

In the meantime, Stoner and Wiley reviewed medical notes that Plaintiff had provided in support of her sick leave request on December 26, 2017 and determined that the notes failed to meet the requirements of Employee Labor Manual ("ELM") Policy 513.

(Doc. 24-5 ¶ 18; Doc. 24-9 at 29-30.)  As a result, Stoner charged Plaintiff with Absence Without Leave for December 26, 2017.  (Doc. 26-1 at 2.)

On February 13, 2018, Stoner conducted a second fact-finding interview, which covered allegations that: (1) Plaintiff had contacted three subordinates about the investigation (Doc. 25-6 at 28-32); (2) Plaintiff never intended to report to work on December 26, 2017 (*id.* at 32-35); (3) Plaintiff regularly delayed the opening of the retail window without authorization (*id.* at 35-38); (4) Plaintiff untimely denied a clerk's leave request for December 26, 2017 (*id.* at 38-39); (5) Plaintiff made an unprofessional statement about a former employee (*id.* at 39-40); and (6) an audit revealed alleged financial discrepancies over bait money orders and stamp shipments received (*id.* at 40-41).

### B.   Plaintiff's Protected Activity And Notification To Stoner

On December 28, 2017, Plaintiff made initial contact with an EEO counselor.  (Doc. 26-3 at 28.)

On January 13, 2018, Plaintiff informed Stoner (via email and text) that Plaintiff had filed an EEO complaint against her.  (Doc. 26-4 at 2.)[3]  In an affidavit prepared as part of the EEO proceedings, Plaintiff avowed under penalty of perjury that this was the first time she informed Stoner about the complaint.  (Doc. 25-7 ¶¶ 20-21.)  However, in a subsequent declaration prepared as part of this case, Plaintiff avowed that she actually informed Stoner about the EEO complaint on December 28, 2017.  (Doc. 29-2 ¶ 22.)

### C.   Plaintiff's Tenure At The Flagstaff Post Office

While in Flagstaff, one of Plaintiff's assigned responsibilities was to conduct street observations of carriers using PS Form 4584.  (Doc. 26-8 ¶¶ 9-11.)  Under USPS policy, management must notify a carrier of the observation, notify the carrier upon completion of the observation, and obtain information from the carrier (*e.g.*, a driver's license number) to

---

[3]      In her declaration, Stoner contends that she "had no knowledge of any protected EEO activity [by Plaintiff] before she was contacted by Irene Mier, the EEO Dispute Resolution Specialist on March 15, 2018." (Doc. 24-5 ¶ 3.)  This is inaccurate.  The record shows that Plaintiff sent an email to Stoner on January 13, 2018 stating: "Please be advised that as of 1/09/2018, I have filed an EEO complaint against you."  (Doc. 26-4 at 2.)

complete the PS Form 4584.  (*Id.*)

Between January 3 and March 22, 2018, Plaintiff conducted over fifty clerk and carrier observations.  (Doc. 29-2 ¶ 25.)  However, Plaintiff was instructed not to contact Flagstaff supervisors, who knew the routes, to assist her.  (*Id.* ¶ 26.)

Between February 20 and June 22, 2018, Rosemarie Grapp ("Grapp") was Acting Postmaster of the Flagstaff Office.  (Doc. 26-8 ¶ 2.)  Stoner requested that Grapp take over the position to temporarily replace another USPS employee who was pregnant and restricted to light duty.  (Doc. 29-8 at 4-5.)  Grapp did not know why Plaintiff had been assigned to the Flagstaff Office but understood that, per Stoner's instructions, one of Plaintiff's duties was to conduct carrier observations.  (Doc. 26-8 ¶ 4; Doc. 26-9 at 6-8.)  It is undisputed that Grapp was unaware of Plaintiff's EEO activity during the entirety of Grapp's tenure as Acting Postmaster in Flagstaff.  (Doc. 26-8 ¶ 15.)

Grapp soon observed that Plaintiff was only returning a fraction of the observation reports she was assigned to complete.  (Doc. 26-8 ¶ 10; Doc. 26-9 at 10-11.)  When Grapp asked about this, Plaintiff said she had run out of time or could not find the carrier.  (Doc. 26-8 ¶ 10; Doc. 26-9 at 15-16.)  In response, Grapp sent Plaintiff a link to the "RIMS" app, which is used to locate carriers, and provided training on how to use it.  (Doc. 26-8 ¶ 10; Doc. 26-9 at 12-13.)  Plaintiff contends the app was installed on her older personal phone and not her postal phone, which complicated the use of the app.  (Doc. 29-2 ¶ 25-26.)

Grapp also noticed that Plaintiff had turned in a number of forms that did not have the required driver's license expiration date.  (Doc. 26-8 ¶ 11.)  When Grapp followed up with two carriers for that information, both stated that they had not seen Plaintiff and had not been observed that day.  (*Id.* ¶ 11.)  Grapp became concerned that Plaintiff was not conducting the observations.  (Doc. 26-9 at 19.)  She decided to place a GPS scanner on the USPS vehicle used by Plaintiff to see if Plaintiff was completing her assignments.  (Doc. 26-8 ¶¶ 12-13; Doc. 26-9 at 10-12.)

Grapp informed Stoner of her suspicions and her intent to place the scanner on Plaintiff's vehicle.  (Doc. 26-8 ¶ 12; Doc. 26-9 at 18-21.)  Stoner, in turn, contacted OIG

1   and learned that it was permissible to track the movements of a USPS vehicle with a USPS

2   GPS scanner.  (Doc. 24-9 at 43.)  Even so, Grapp would have placed the scanner on the

3   trunk without authorization from Stoner or OIG, as she had done before with a male

4   employee while serving as a supervisor in New Mexico.  (Doc. 26-8 ¶ 12; Doc. 26-9 at 22-

5   23.)  The male employee was ultimately terminated, but the termination was not upheld.

6   (Doc. 29-8 at 10.)

7        On March 22, 2018, Grapp placed a GPS scanner on a USPS vehicle and told

8   Plaintiff to use that vehicle during her observations.  (Doc. 26-8 ¶ 12.)  Grapp did not

9   inform Plaintiff of the scanner's presence.  (Doc. 26-9 at 17.)  Before lunch, Plaintiff

10  reported to Grapp that the RIMS program had a delay on it.  (Doc. 26-8 ¶ 13.)  Grapp

11  logged onto the RIMS program on both the computer and her cell phone, and both showed

12  the identical location of the carrier with no time lag being evident.  (Doc. 26-8 ¶ 13; Doc.

13  26-9 at 9-10, 17.)  Grapp also checked the data from the GPS scanner to see where Plaintiff

14  had driven that morning and determined that Plaintiff had driven around but did not appear

15  to have followed any carrier.  (Doc. 26-7 [GPS Data]; Doc. 26-8 ¶ 13; Doc. 26-9 at 24-27.)

16  But Grapp did not directly check how the RIMS app was working on Plaintiff's phone, and

17  although she knew the GPS scanner's battery was full and did not need repair, she did not

18  know how recently it had been replaced.  (Doc. 29-8 at 6, 9.)

19       Plaintiff turned in a form stating she had observed USPS carrier Dyan

20  Kewanwytewa from 11:17 to 11:39 a.m.  (Doc. 26-6 at 3.)  But the GPS data suggested

21  that Plaintiff was at a coffee shop and simply driving around during that timeframe and

22  was not near Kewanwytewa's vehicle.  (Doc. 25-3 at 7-8; Doc. 26-8 ¶ 14.)  In a written

23  statement, Kewanwytewa stated she did not know of anyone following her and was not

24  approached about an observation.  (Doc. 26-8 ¶ 14; Doc. 26-9 at 27; Doc. 26-10.)

25       Grapp talked to one more carrier whom Plaintiff claimed to have observed, and he

26  stated he had not been observed.  (Doc. 26-9 at 27.)  Furthermore, Grapp compared the

27  data from the scanner report to three observation forms that Plaintiff had turned in that day.

28  (Doc. 26-8 ¶ 14.)  According to Grapp, the GPS data and the forms did not match.  (*Id.*)

1   Grapp reported this information to Stoner.  (*Id.*)

2       On April 12, 2018, Stoner conducted a third fact-finding interview, which focused

3   on Plaintiff's street carrier observations.  (Doc. 25-6 at 44-50.)

4       On April 13, 2018, Stoner placed Plaintiff on administrative leave pending a

5   determination of the investigative matter.  (Doc. 27 at 2.)  Ultimately, Stoner determined

6   that Plaintiff could not have conducted the observations and instead provided false

7   information on her driver safety evaluations.  (Doc. 24-9 at 44-46; Doc. 25-3 at 7-10; Doc.

8   26-8 ¶ 14; Doc. 26-9 at 29-31.)

9       D.   **Denial Of Request To Convert Annual To Sick Leave**

10      Plaintiff approved her own annual leave for January 24, 2018, then sought to switch

11  it to sick leave when she woke up with pink eye.  (Doc. 27-1 at 2; Doc. 29-2 ¶ 24.)  Stoner

12  informed Plaintiff that she would need a doctor's note to convert her annual leave to sick

13  leave.  (Doc. 29-2 ¶ 24.)

14      Plaintiff provided a doctor's note which stated, "Patient is unable to work due to

15  illness.  Return to work 1/26/18."  (Doc. 27-2 at 2.)  That note was originally dated January

16  28, 2018, but that date was crossed out and revised to read January 24, 2018.  (*Id.*)  Plaintiff

17  also provided a second note, dated January 29, 2018, entitled "Time off clarification,"

18  which stated that Plaintiff required 24 hours off "due to her medical diagnosis" and that no

19  further information could be provided "due to HIPPA privacy."  (*Id.* at 3.)

20      Stoner informed Plaintiff that the documentation did not meet USPS requirements

21  and that the approved annual leave could not be converted to sick leave.  (Doc. 27-3 at 2.)

22  Plaintiff's absence on January 24, 2018 thus remained as annual leave.  (*Id.*)

23      E.   **Notice Of Proposed Removal And Reduction In Employment Grade**

24      On June 25, 2018, following the completion of the investigation, Stoner issued

25  Plaintiff a Notice of Proposed Removal ("NOPR").  (Doc. 25-3 at 2-15.)  The NOPR

26  specified two charges: (1) Failure to Meet the Duties and Responsibilities of Your Position;

27  and (2) Unacceptable Conduct.  (*Id.* at 2-15.)

28      The deciding official with respect to the NOPA was Troy Weber.  (Doc. 27-4.)  It

is undisputed that Weber was unaware of Plaintiff's EEO activity at the time of the decision.  (Doc. 27-5 ¶ 15.)

On January 24, 2019, Weber issued a decision to downgrade Plaintiff to a Clerk position in Crown Point, New Mexico.  (Doc. 27-4 at 2.)  While ultimately deciding not to terminate Plaintiff's employment, Weber noted that "the charge as stated in the [NOPR] is fully supported by the evidence and would warrant [Plaintiff's] removal from the Postal Service."  (*Id.*)

As for Plaintiff's December 26, 2017 absence, Weber found that Plaintiff's behavior showed she had no intention of reporting to work that day.  (*Id.*)  In support of this conclusion, Weber cited Plaintiff's failure to follow the direct order of her supervisor; her expressed anticipation of calling in sick; her directing a subordinate to work that day in her stead; her failure to update the posted schedule after being given the order to report; and her bringing the office keys to the home of a sick subordinate three days beforehand.  (*Id.*)  Weber stated that these actions were "unethical, unprofessional and not condoned" and "contrary to what is expected of postal employees and especially from a Postmaster."  (*Id.*)  Weber also noted that because of Plaintiff's absence that day, the Holbrook Office incurred several failures for which Plaintiff was responsible.  (*Id.*)  Weber also noted that Plaintiff had denied a subordinate's leave request for December 26, 2017 that had been submitted seven months in advance, while taking that day off for herself.  (*Id.*)  Weber explained that this demonstrated a total disregard for office operations and that these actions, standing alone, merited her removal.  (*Id.*)

Weber identified more behavior that supported his decision, including: Plaintiff having directed carriers not to deliver parcels to the door ("an egregious dereliction of your duties"); failing to properly report a stamp discrepancy worth $340.00 and providing false information to balance the books ("you cannot be relied upon to be honest and trustworthy"); and delaying retail operations without previous notification or authorization ("lack of good judgment and unreliability as a Postmaster").  (*Id.* at 3.)  Weber also found that Plaintiff had abused her position by contacting at least three subordinates about the

investigation, which was unethical, unprofessional and could have tainted the investigation; made an unprofessional comment that a potluck was held to celebrate having gotten rid of an employee; and falsely reported a street observation.  (*Id.*)  Weber determined that Plaintiff's actions were "egregious in nature" and that "the trust bestowed upon [her] as a Postmaster has been irrevocably eroded."  (*Id.*)  As a result, Weber concluded that "it would not be in the best interest of the Postal Service, nor would it promote its efficiency to retain [Plaintiff] in a position where [she worked] alone and/or unsupervised."  (*Id.*)  Nevertheless, Weber stated that Plaintiff could be "rehabilitated into a position where [she does not] supervise others and where [she does not] make operational decisions."  (*Id.*)[4]

Before issuing this decision, Weber spoke with Wiley about the potential downgrade of Plaintiff to a craft level position instead of her removal.  (Doc. 27-5 ¶ 11-13.)  Wiley and Weber consulted with Area Labor Relations to find vacant, funded, available positions.  (*Id.*)  As reflected in a Memorandum of Understanding ("MOU") between USPS and the American Postal Workers Union ("APWU"), there is "an intricate step by step process, also known as a pecking order, to fill craft positions," and "[c]raft employees have priority over these positions."  (Doc. 25 ¶ 16; Doc. 27-6 [MOU].)  The Crown Point, New Mexico Clerk position had been posted for external hire when Wiley sought to identify eligible positions.  (Doc. 25 ¶ 16.)

Defendant presents evidence that although Crown Point was three hours away from Plaintiff's residence, it was also geographically the closest eligible position to the Holbrook Post Office.  (*Id.*)  However, Fernando Rodriguez, the President of the APWU, told Plaintiff that assigning her to Crown Point violated her union contract and that there were at least two open clerk positions within 50 miles of her residence that Plaintiff was qualified to fill.  (Doc. 29-14 ¶ 5.)

---

[4]    Plaintiff had a right to due process before being terminated or demoted.  The parties dispute whether Plaintiff's representative contacted Weber to set up a due process meeting in advance of his decision.  (Doc. 27-5 ¶¶ 8-9; Doc. 29-10 ¶¶ 3-4.)  Because the factual dispute on this point is immaterial to the summary judgment analysis, the Court flags it simply for the sake of completeness.

Plaintiff began her position in Crown Point on February 2, 2019.  (Doc. 27-4 at 3.)  However, the agency subsequently rescinded the downgrade decision, returned Plaintiff to administrative leave pending consideration of other disciplinary action, and paid her back pay, interest, and benefits commensurate with the position she was in before the downgrade.  (Doc. 27-8 at 2.)

Finally, it is undisputed that "on April 4, 2020, Stoner issued a Notice of Proposed Reduction in Grade, from Level 18 Postmaster to Level 17 Supervisor in Flagstaff, based upon the events described above.  A Deciding Official affirmed that demotion, effective July 4, 2020."  (Doc. 24 at 9.)

F.    **Observers' Perceptions Of Plaintiff's Discipline**

Billy Garrett, a retired Postmaster and Plaintiff's former union advocate, informed Plaintiff that hers "was the oddest case [he] had been involved with during [his] years as a representative" and that he believed "they were after her and that they would take her out [any way] that they could."  (Doc. 29-5 ¶ 3.)  Garrett also asserts in a declaration that Plaintiff's reassignment to Crown Point was "clearly punitive."  (*Id.* ¶ 7.)

Debbie Holyoak, Postmaster of the Vernon, Arizona Post Office, states in a declaration that "[t]he treatment of [Plaintiff] went above and beyond retaliation."  (Doc. 29-12 ¶ 6.)  She describes Plaintiff's reassignment to Crown Point as "punitive."  (*Id.* ¶ 7.)

Postmaster Jaquita Deter, also at one point Plaintiff's union advocate, describes the reassignment to Crown Point as "vicious."  (Doc. 29-10 ¶ 7.)

II.    Procedural History

On December 28, 2017, Plaintiff contacted the EEO office to challenge the denial of her leave request, her initial placement on administrative leave, and Stoner's refusal to accept the sick leave documentation she provided.  (Doc. 26-3 at 14, 28.)  A final agency decision issued on April 26, 2020 in the agency's favor.  (*Id.* at 60.)

Separately, on February 21, 2019, Plaintiff appealed her demotion to the Merit Systems Protection Board ("MSPB").  (Doc. 27-9 at 2.)  On February 6, 2020, the MSPB issued an Initial Decision in favor of USPS.  (*Id.*)  The MSPB rejected Plaintiff's contention

that her demotion "was reprisal for her prior EEO activity," finding among other things that "while [Plaintiff] contends Stoner's behavior towards her changed after Stoner became aware [Plaintiff] filed an EEO complaint naming Stoner, [Plaintiff's] own allegations regarding Stoner's alleged inappropriate treatment toward her reflect Stoner treated [Plaintiff] in a manner [Plaintiff] found inappropriate prior to [Plaintiff] filing an EEO complaint or notifying Stoner she intended to do so"; that although "tracking [Plaintiff] with the use of the scanner was out of the ordinary . . . tracking [Plaintiff's] whereabouts using a scanner is not reflective of retaliatory intent, in part because the record contains no evidence Grapp was aware [Plaintiff] engaged in EEO activity when she decided to do so"; and that although "Weber's ultimate decision to downgrade [Plaintiff] to a PTF position in Crown Point—3 hours drive from [Plaintiff's] residence—was undoubtedly inconvenient . . . Weber's conclusion [Plaintiff] was not eligible to be placed into a PTF position unless it was open for external hire [was] reasonable under the circumstances" because "Weber was placing [Plaintiff]—an individual outside the applicable craft—into a craft position with his decision, and the agreement provisions applicable to placing an individual from outside the craft into a position would appear to be applicable to his decision." (*Id.* at 7-14.) Plaintiff appealed, and the Office of Federal Operations ("OFO") issued a final decision in USPS's favor on September 16, 2020. (Doc. 27-10 at 2.)

On October 15, 2020, Plaintiff initiated this action by filing the complaint. (Doc. 1.)

On October 7, 2021, Defendant filed a motion for summary judgment. (Doc. 24.) The motion thereafter became fully briefed. (Docs. 29, 30.) Neither side requested oral argument.

## ANALYSIS

### I.    Legal Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of

the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that

evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

II.    Discussion

The sole claim in the complaint is for "Retaliation (Hostile Environment)" in violation of Title VII. (Doc. 1 ¶¶ 23-28.)  Plaintiff's theory is that she engaged in protected activity when she "opposed gender plus race discrimination in good faith and when she participated in the EEO process by filing an EEO complaint of discrimination" and that she was thereafter subjected to retaliation as a result of this protected activity.  (*Id.* ¶ 24.)

Title VII prohibits an employer from discriminating "against any of [its] employees . . . because [that employee] has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  A plaintiff who alleges unlawful retaliation in violation of Title VII must first establish a *prima facie* case.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  To do so, a plaintiff must establish that "(1) she had engaged in protected activity; (2) she was thereafter subjected by her employer to an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action."  *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005).  If the plaintiff establishes a *prima facie* case, the burden shifts and the defendant must articulate a legitimate, non-retaliatory reason for its action.  *Id.*  If the defendant does so, the plaintiff bears the ultimate burden of showing that the defendant's proffered reasons are "merely a pretext for a retaliatory motive."  *Id.*

In the motion for summary judgment, Defendant concedes that Plaintiff engaged in protected activity but argues that Plaintiff cannot otherwise establish a *prima facie* case of retaliation and/or that USPS had legitimate, non-retaliatory reasons for its actions.  (Doc. 24 at 10.)  Plaintiff's arguments in response are not a picture of clarity (and are unresponsive to many of Defendant's arguments).  (Doc. 29.)  As discussed in more detail below, Plaintiff's general argument seems to be as follows: (1) Stoner immediately became aware of her protected activity; (2) she was exposed to "immediate retaliation" after filing the EEO complaint, as evidenced by the fact that some of the subsequent actions taken by

Stoner and Grapp (*e.g.*, denying her sick leave request, using a tracker) were contrary to policy and/or unusual; (3) the use of a GPS tracker qualifies as a type of "heightened scrutiny or strict scrutiny" that itself is evidence of retaliation; (4) the retaliation continued when Weber ordered her demotion without respecting her due process rights; and (5) the reassignment to Crown Point is further evidence of retaliation and a hostile work environment because the position was far from her home and only offered sporadic work. (*Id.*)

With this backdrop in mind, the Court turns to the required elements of Plaintiff's claim and the parties' arguments.

A.  **Prima Facie Case**

1.  <u>Protected Activity And Plaintiff's Disclosure Thereof</u>

"Protected activity includes the filing of a charge or a complaint, or providing testimony regarding an employer's alleged unlawful practices, as well as engaging in other activity intended to oppose an employer's discriminatory practices." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003) (cleaned up).  It is undisputed that Plaintiff first engaged in protected activity on December 28, 2017, when she made contact with an EEO counselor.  (Doc. 26-3 at 28.)  It is also undisputed that Plaintiff informed Stoner of her EEO complaint by no later than January 13, 2018.  (Doc. 26-4 at 2.)

Plaintiff contends that Stoner actually became aware of her protected activity on December 28, 2017.  (Doc. 29 at 3.)  Plaintiff asserts that Stoner admitted as much during the initial fact-finding interview on December 28, 2017, when Stoner "informed Plaintiff that she had been told that the Plaintiff was filing an EEO complaint against her."  (Doc. 29 at 3.)  The sole support identified by Plaintiff for this supposed admission by Stoner is Plaintiff's own declaration.  (Doc. 29-2 ¶ 22.)  Stoner, in turn, denies becoming aware of the EEO complaint until 2018.  (Doc. 24-5 ¶ 3.  *See also* footnote 3 *supra*.)

Ordinarily, this sort of factual dispute would need to be resolved in favor of Plaintiff, as the non-movant, at summary judgment.  Because Plaintiff was a party to her December

28, 2017 conversation with Stoner, she may testify to supposed admissions that Stoner made during that conversation.  *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001) ("[S]elf-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory.").

The wrinkle here is that Plaintiff's statement in her declaration is contradicted by sworn statements that Plaintiff previously made in related proceedings.  On June 6, 2018, Plaintiff completed and signed an "Investigative Affidavit" as part of the EEO process. (Doc. 25-7 at 1.)  That affidavit contained a section entitled "Retaliation Allegation," which asked Plaintiff to identify her "previous EEO activity."  (*Id.* at 4.)  In response, Plaintiff identified the EEO complaint relevant here.  (*Id.* at 5.)  Plaintiff was then asked "[w]as/were the management official(s) you cited in this complaint involved in your prior EEO activity? . . . If they were not involved in the prior cases, were they aware of your prior EEO activity, and if so, how, and *when did they become aware*?"  (*Id.*, emphasis added.)  Plaintiff responded: "[Stoner] was involved in this EEO as I had informed her on January 13, 2018, that I had filed an EEO against her on 1/09/2018, which was the date I filed the paperwork for the EEO."  (*Id.*)

Defendant argues that Plaintiff's contention that she disclosed her protected activity to Stoner on December 28, 2017 "is insufficient because it contradicts Plaintiff's own prior statements." (Doc. 30 at 3.)  The Court agrees.  In *Breeser v. Menta Group, Inc., NFP*, 934 F. Supp. 2d 1150 (D. Ariz. 2013), the court addressed a similar situation.  There, one of the disputed issues was whether the plaintiff's claim against his former employer was time-barred.  *Id.* at 1157-58.  The defendants argued that the plaintiff had been terminated on March 1, 2009, and proffered evidence to that effect.  *Id.* at 1158.  Most significant was a form the plaintiff had submitted to the Arizona Department of Economic Security ("ADES") in which the plaintiff identified the termination date as March 1, 2009.  *Id.* at 1158-59.  Nevertheless, the plaintiff sought to avoid summary judgment by arguing that the termination date was actually later and that she wrote March 1, 2009 in the ADES form only "because that was the date that *Defendant* told the State that she was terminated."  *Id.*

at 1159 (emphasis added).  The court rejected this argument, concluding that the plaintiff could not create "a disputed issue of fact based merely on [plaintiff] contradicting her own prior statements."  *Id.* at 1159.

Similarly, in *Parker v. Arizona*, 2019 WL 2136290 (D. Ariz. 2019), one of the disputed issues was whether the plaintiff had ever made a disability accommodation request to his employer.  *Id.* at *4.  Although the plaintiff submitted a declaration avowing that he had made such a request to three of his supervisors, the plaintiff previously admitted, during a deposition in a related administrative proceeding for workers' compensation benefits, that he hadn't made an accommodation request to two of those supervisors.  *Id.*  The court held that these circumstances implicated the "sham affidavit" rule, "even though Defendants seek to invoke it based on the deposition testimony that Parker provided in an *earlier* case (as opposed to the typical scenario where a party makes admissions during a deposition in the *pending* case and then seeks to sidestep those admissions by submitting a contradictory post-deposition declaration)," because "the general consensus seems to be that sworn statements made in prior proceedings may trigger the doctrine while unsworn statements may not."  *Id.* at *4-5 (citations omitted).  The court further held that, because "this is not a case where the inconsistency between Parker's 2015 deposition testimony and the testimony he provided in this case can be chalked up to an honest mistake, ambiguity, or newly discovered evidence," the plaintiff could not rely on his declaration to the extent he was seeking to disavow his previous admission, made under penalty of perjury, that he hadn't made accommodation requests to two of the supervisors. *Id.* at *5-6.

*Breeser* and *Parker* support Defendant's position regarding the timing of Plaintiff's disclosure to Stoner.  During a related administrative proceeding, Plaintiff swore under penalty of perjury that Stoner first became aware of her EEO complaint on January 13, 2018.  (Doc. 25-7 at 5.)  This is consistent with the documentary evidence in the record. (Doc. 26-4 at 2.)  And Plaintiff has made no attempt to argue that the difference between her sworn statement to the EEO and the declaration she submitted as part of this case, in

1    which she claims the disclosure actually occurred on December 28, 2017, is somehow the

2    result of an honest mistake, ambiguity, or newly discovered evidence.[5]  Indeed, Plaintiff

3    does not even acknowledge the discrepancy in her summary judgment brief.

4          Thus, there is no genuine dispute of fact about when Stoner gained awareness of

5    Plaintiff's protected activity.  Stoner became aware on January 13, 2018.

6                2.    Adverse Employment Action Caused By Protected Activity

7          Plaintiff has established that she engaged in protected activity, but to make out a

8    *prima facie* case of retaliation, she must also establish that she experienced an adverse

9    employment action that was caused by the protected activity.  *Porter*, 419 F.3d at 894.

10          Title VII's anti-retaliation provision "protects an individual not from all retaliation,

11    but from retaliation that produces an injury or harm. . . .  [A] plaintiff must show that a

12    reasonable employee would have found the challenged action materially adverse, which in

13    this context means it might well have dissuaded a reasonable worker from making or

14    supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548

15    U.S. 53, 67-68 (2006) (cleaned up).  Of course, "the significance of any given act of

16    retaliation will often depend upon the particular circumstances. . . .  [A]n act that would be

17    immaterial in some situations is material in others."  *Id.* at 69 (cleaned up).

18          The Supreme Court has established a standard of *material* adversity because "it is

19    important to separate significant from trivial harms. . . .  An employee's decision to report

20    discriminatory behavior cannot immunize that employee from those petty slights or minor

21    annoyances that often take place at work and that all employees experience. . . .  [N]ormally

22    petty slights, minor annoyances, and simply lack of good manners will not [suffice]."  *Id.*

23    at 68.

24          Finally, Plaintiff must prove that her protected activity was the "but-for" cause of

25    the adverse employment action.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352

26

---

27    [5]      The EEO affidavit did not simply ask for a list of times that Plaintiff had informed
      Stoner of the complaint—it prompted Plaintiff to declare *when Stoner had become aware*
28    of the complaint.  (Doc. 25-7 at 5.)  Plaintiff was represented by counsel when submitting
      the affidavit.  (*Id.* at 2.)

(2013).  "Essential" to the causation question is "evidence that the employer was aware that the plaintiff had engaged in the protected activity."  *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).  What's more, "[e]mployers need not suspend previously planned [acts] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, although not yet definitively determined, is no evidence whatever of causality."  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).

### i.   **Alleged Adverse Actions**

Plaintiff does not set forth a comprehensive list of alleged adverse employment actions—her complaint is in a narrative format and her response to the motion for summary judgment is largely duplicative of the complaint.  Nevertheless, the Court has constructed the following list of adverse employment actions that Plaintiff may have alleged in the complaint, supplemented by any available explanation in Plaintiff's response:

1.  Less favorable treatment after Stoner became Plaintiff's supervisor, including "threats of an investigation, being yelled at, denied leave in direct conflict with postal regulations, and direct adverse interference with the Plaintiff's staff and operations."  (Doc. 1 ¶ 10.)

2.  Stoner's handling of leave requests on December 26, 2017, December 28, 2017, and January 24, 2018.  (Doc. 1 ¶¶ 12, 17-1;[6] Doc. 29 at 4.)

3.  Stoner assigning Plaintiff to work at the Flagstaff Post Office during the fact-finding investigation.  (Doc. 1 ¶ 16.)

4.  Grapp placing RIMS on Plaintiff's cell phone.  (Doc. 1 ¶ 17-2; Doc. 29 at 5.)

5.  Grapp placing a GPS scanner on Plaintiff's assigned postal truck.  (Doc. 1 ¶ 18; Doc. 29 at 5.)

6.  Restriction of Plaintiff's access to her business emails and work computer.  (Doc. 1 ¶ 17-1.)

---

[6]   The complaint lists paragraph 17 twice.  The Court will refer to them as paragraphs 17-1 and 17-2.

7.  Weber demoting Plaintiff to a Clerk position without a due process meeting and relocating her to the Crown Point office.  (Doc. 1 ¶ 19; Doc. 29 at 8.)

### ii.      **The Parties' Arguments**

In the motion for summary judgment, Defendant argues that (1) actions taken before Plaintiff's protected activity, or without the decisionmakers' knowledge of that protected activity, cannot be acts of retaliation; and (2) many challenged actions are not adverse actions under Title VII.  (Doc. 24 at 11-12.)  First, Defendant argues that Stoner's actions taken before December 28, 2017 were not caused by Plaintiff's protected activity, which occurred on December 28, 2017.  (*Id.* at 12.)  Further, Defendant contends that Grapp's decision to place the scanner on Plaintiff's vehicle and Weber's decision to demote Plaintiff cannot be retaliatory because neither knew that Plaintiff had engaged in protected activity.  (*Id.*)  Second, Defendant argues that (1) Stoner's denial of Plaintiff's leave requests is no more than a minor annoyance that all employees may experience; (2) Plaintiff's reassignment to Flagstaff was not *materially* adverse because she retained her title and pay; (3) assigning Plaintiff to conduct carrier observations was not an adverse action because Plaintiff was already conducting those observations as part of her job in Holbrook; (4) Grapp placing the GPS scanner on Plaintiff's USPS vehicle did not impede her ability to perform her job; and (5) other claims are too vague to comply with Rule 8 of the Federal Rules of Civil Procedure.  (Doc. 24 at 12-15.)

Plaintiff does not directly respond to any of Defendant's arguments.  Interpreted generously, Plaintiff argues that (1) Stoner's requests for medical documentation related to the sick leave requests violated Plaintiff's HIPAA rights and exceeded the necessary standard (Doc. 29 at 3-4); (2) surveillance is an adverse and inappropriate action, presumably referring to either the RIMS app or GPS scanner (*id.* at 5-8); (3) Weber's decision to demote Plaintiff violated her due process rights (*id.* at 8-9); and (4) Plaintiff's reassignment to Crown Point, a six-hour round trip, was punitive given the availability of closer options (*id.* at 9-10).

Defendant, in reply, reasserts that actions taken before Plaintiff's protected activity,

- 19 -

as well as the decision to reassign Plaintiff to Flagstaff, cannot be causally linked to her protected activity. (Doc. 30 at 2-3.) Defendant also expands on the argument that denying sick leave and surveilling Plaintiff's performance were not adverse actions caused by protected activity.

### iii.   **Analysis**

In the interest of clarity, the Court will address each possible adverse action separately.

### a.   Less Favorable Treatment

Although Plaintiff alleged several categories of "less favorable treatment" in the complaint (threats of investigation, being yelled at, direct adverse interference with staff, denial of leave) (Doc. 1 ¶ 10), she only addresses the denial of leave requests in her response to the motion for summary judgment (Doc. 29 at 3-4.) The Court will discuss the denial of leave in the following section and finds that all other claims of "less favorable treatment" adverse action are forfeited. Additionally, it appears that all of those instances of "less favorable treatment" occurred before Plaintiff made the initial EEO complaint on December 28, 2017 and before Stoner became aware of that complaint on January 13, 2018.

### b.   Denial Of Leave

Plaintiff objects to Stoner's handling of three leave requests.

The December 26, 2017 request was denied before Plaintiff engaged in protected activity. (Doc. 26-3 at 28.) Thus, Plaintiff's protected activity was not the but-for cause of Stoner's action.

The December 28, 2017 request was denied before Stoner became aware of Plaintiff's protected activity. (Doc. 29 at 4.) Thus, the protected activity was not the but-for cause of Stoner's action.

As for the January 24, 2018 request, although it is true this request was made and denied after Stoner became aware of Plaintiff's protected activity, there is no evidence from which a reasonable juror could conclude the rejection was retaliatory. Not only did Stoner reject this request based on a clear deficiency in Plaintiff's documentation, but Stoner

provided the same reason for rejecting Plaintiff's December 26, 2017 request.   The December 26, 2017 documentation reads: "Loretta Short is under my care beginning 12/26/2017.  She is excused from work on 12/26/2017."  (Doc. 25-10 at 2.)  The January 24, 2018 documentation reads: "Patient is unable to work due to illness.  May [return to work] 1/26/18."  (Doc. 27-2 at 2.)  Both requests were clearly deficient under ELM 513.364, which requires an "explanation of the nature of the employee's illness or injury sufficient to indicate to management that the employee was (or will be) unable to perform his or her normal duties for the period of absence.  Normally, medical statements such as 'under my care' or 'received treatment' are not acceptable evidence of incapacitation to perform duties."  (Doc. 26 at 3.)  The December 26, 2017 note typifies unacceptable documentation, and although the January 24, 2018 note omits the offending phrase "under my care," it provides no detail about the nature of Plaintiff's illness, as required by ELM 513.364.  Even if this requirement violates Plaintiff's HIPAA rights (and the Court is dubious), Stoner followed the policy both times.  Given that the notes are substantively identical and Stoner had already denied the first note for obviously non-retaliatory reasons—at that time, she was not even aware of any protected activity—Plaintiff cannot prove that Stoner would not have denied the second doctor's note if Plaintiff had not filed an EEO complaint.

Alternatively, even if Plaintiff could prove that her EEO complaint caused Stoner to reject her January 24, 2018 documentation, this rejection was not a *materially* adverse employment action.  "Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion."  *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).  The loss of a single vacation day—the rejection of the documentation simply meant that Plaintiff had to use annual leave rather than sick leave for her absence—did not materially impact the trajectory of Plaintiff's career as would termination, a bad reference or review, or denial of promotion.  Nor would it have "dissuaded a *reasonable* worker from making or supporting

a charge of discrimination."  *Burlington*, 548 U.S. at 67-68 (emphasis added).

### c.   Reassignment To Flagstaff

On December 27, 2017, Stoner placed Plaintiff on administrative leave and ordered her to report to a fact-finding interview on December 28, 2017.  After the first fact-finding interview, Stoner assigned Plaintiff to work at the Flagstaff Post Office pending further investigation, effective December 29, 2017.

Stoner's decision to place Plaintiff on administrative leave and order her to a fact-finding session occurred before Plaintiff engaged in protected activity, and Stoner's decision to reassign Plaintiff to Flagstaff occurred before Stoner became aware that Plaintiff had engaged in protected activity.  Plaintiff's protected activity thus cannot be the but-for cause of Stoner's actions.  *Nassar*, 570 U.S. at 352; *Cohen*, 686 F.2d at 796.

### d.   Electronic Surveillance (RIMS And GPS Scanner)

Plaintiff does not seem to contend that Grapp's installation of the RIMS app was a standalone adverse employment action.  Although Plaintiff asserts that the RIMS app was ineffective and inaccurate, it is not clear how that fact, even taken as true, would qualify as an adverse action.  Plaintiff regularly used RIMS while in Holbrook.  (Doc. 24-2 at 33; Doc. 26-8 ¶ 8.)  That the app did not work properly because it was installed on Plaintiff's outdated personal phone is, without more,[7] at most a "minor annoyance" that does not rise to the level of a materially adverse employment action.  *Burlington*, 548 U.S. at 68.

As for the GPS scanner/tracking, it is undisputed that Grapp independently decided[8] to install the GPS scanner (Doc. 26-8 ¶ 12-13; Doc. 26-9 at 10-12), would have done so without authorization from Stoner or OIG (Doc. 26-8 ¶ 12; Doc. 26-9 at 22-23), and was unaware of Plaintiff's EEO activity when doing so (Doc. 26-8 ¶ 15).  Even if installing the GPS scanner was unusual or "despicable" (Doc. 29-5 ¶ 6), it was not retaliatory for Title

---

[7]   Plaintiff does not allege, for example, that Grapp intentionally chose to install the RIMS app on Plaintiff's personal phone so that Grapp could track her movements outside work hours.

[8]   Although Plaintiff alleged in the complaint that Grapp installed RIMS at Stoner's direction (Doc. 1 ¶ 17-2), she did not allege (in either the complaint or response to the motion for summary judgment) that Stoner directed installation of the GPS scanner.  (Doc. 1 ¶ 18.)

1   VII purposes because Grapp was unaware of Plaintiff's protected activity.  *Cohen*, 686

2   F.2d at 796.  And, importantly, Plaintiff does not allege that Stoner—who *was* aware of

3   the protected activity—influenced Grapp's decision to install the scanner.

e.   Business Emails And Work Computer

5          Much like Plaintiff's assertion of "less favorable treatment," Plaintiff does not, in

6   her response to the summary judgment motion, mention or rely upon (let alone attempt to

7   substantiate) the allegations in her complaint regarding restrictions on her business emails

8   and computer.  (Doc. 1 ¶ 17-1.)  Thus, this claim is forfeited.

f.   Demotion And Relocation To Crown Point

10          Liberally construed, Plaintiff alleges that Weber's (1) failure to provide due process

11   before reaching the demotion decision, (2) demotion decision, and (3) choice of Crown

12   Point as a relocation destination are independently cognizable adverse employment

13   actions.

14          When Weber issued the Letter of Decision in January 2019, he was unaware that

15   Plaintiff had engaged in any protected activity.  (Doc. 27-5 ¶ 15.)  But this issue is not as

16   simple as it would appear.  Weber's inquiry was triggered by Stoner's notice of proposed

17   removal (Doc. 25-3 at 2-15), and Wiley helped influence Weber's choice of Crown Point

18   as a relocation destination (Doc. 27-5 ¶ 13).  Both Stoner and Wiley were, when Weber

19   issued his decision, aware of Plaintiff's protected activity.  (Doc. 25 ¶ 3 [Wiley]; Doc. 26-

20   4 at 2 [Stoner].)

21          Under Ninth Circuit law, "if a subordinate . . . sets into motion a proceeding by an

22   independent decisionmaker that leads to an adverse employment action, the subordinate's

23   bias is imputed to the employer if the plaintiff can prove that the allegedly independent

24   adverse employment decision was not actually independent because the biased subordinate

25   influenced or was involved in the decision or decisionmaking process." *Poland v. Chertoff*,

26   494 F.3d 1174, 1182 (9th Cir. 2007).  This is often called the "cat's-paw" theory.  *Acosta*

27   *v. Brain*, 910 F.3d 502, 514 (9th Cir. 2018).

28          As for Stoner's notice of proposed removal, the Ninth Circuit addressed a similar

situation in *Poland*.  There, after the plaintiff filed an EEO complaint against his supervisor alleging age discrimination, the supervisor initiated an "administrative inquiry" into the plaintiff's performance.  *Id.* at 1178.  At the conclusion of the inquiry, other decisionmakers within the agency decided to reassign the plaintiff to a non-supervisory position in a different state.  *Id.*  In response, the plaintiff asserted a retaliation claim against the agency. *Id.*  at 1179-80.  On appeal, the "vigorously dispute[d]" issue was whether the plaintiff could establish "a causal link between his filing of EEO complaints and the adverse employment actions the Customs Service took against him."  *Id.* at 1180.  The agency argued that because the plaintiff's supervisor "was not the Customs Service employee who made the ultimate decision to take the adverse employment action of transferring [the plaintiff]," which instead occurred only after an "independent inquiry and decisionmaking process," these details "severed the causal link between [the supervisor's] animus-based initiation of the inquiry and the adverse employment action."  *Id.* at 1181.  The Ninth Circuit disagreed, holding that although causation would be lacking if the agency had shielded the supervisor's animus from the independent decisionmaker who made the transfer decision, the agency had failed to provide such shielding because "the panel had access to [the supervisor's] lengthy memo requesting the inquiry in which he outlined numerous incidents of malfeasance by [the plaintiff]. . . .  Because [the supervisor] influenced or was involved in the activity, it was not sufficiently independent to break the causal chain between [the plaintiff's] protected activity and [the agency's] decision to transfer him."  *Id.* at 1183-84.

Here, Stoner launched the investigation and wrote the notice of proposed removal, which was akin to a "lengthy memo requesting [Weber's] inquiry in which [s]he outlined numerous incidents of malfeasance by" Plaintiff.  Because Stoner influenced Weber's activity, Weber's unawareness of Plaintiff's protected activity cannot itself break the causal chain between Plaintiff's protected activity and Weber's decision to demote her.

Finally, it is even more clear that Wiley influenced Weber's decision to choose Crown Point as the transfer destination.  As far as the Court can tell, Weber simply signed

off on a determination that Wiley had already made.  (Doc. 27-5 ¶ 11-13.)

These details do not, however, end the causation inquiry.  Critically, Stoner *began* her investigation into Plaintiff before she became aware of Plaintiff's protected activity.  And "[e]mployers need not suspend previously planned [acts] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, although not yet definitively determined, is no evidence whatever of causality."  *Breeden*, 532 U.S. at 272.   The investigation into Plaintiff's unauthorized absence and deputization of Greymountain began on December 27, 2017, when Stoner visited the Holbrook office, received reports about "the failures the day before," placed Plaintiff on administrative leave, gathered more information about Plaintiff's performance failures, and instructed Plaintiff to report for a formal interview the following day.  (Doc. 27-5 ¶¶ 14-15.)[9]  The questions Stoner asked Plaintiff during the interview on December 28, 2017 (Doc. 25-6 at 2-27) connect directly to her conclusions in the notice of proposed removal (Doc. 25-3 at 2-4), with no indication that Stoner was straying from "lines previously contemplated."  Weber stated that the information Stoner uncovered in that investigation "standing alone would merit your removal."  (Doc. 27-4 at 2.)

Under these circumstances, no reasonable juror could find that Stoner's initiation of the investigation into Plaintiff's performance was retaliatory.  Stoner was unaware of any protected activity at the time she initiated it.  And the fact that Stoner's untainted (*i.e.*, pre-notification) investigation was validated as an independent basis for demotion by Weber (who, again, did not know of Plaintiff's protected activity) makes clear that Plaintiff could not clear the causation hurdle if she tried to connect her protected activity to her demotion under a cat's-paw theory.  Thus, the Court finds that Weber's decision to demote Plaintiff, even if set in motion by Stoner, does not support Plaintiff's *prima facie* retaliation claim.

Wiley's recommendation to assign Plaintiff to Crown Point, by contrast, occurred after Wiley had learned about Plaintiff's protected activity.  Because Defendant does not

---

[9]     Thus, even if it were possible to credit the assertion in Plaintiff's declaration that she first informed Stoner of the EEO complaint on December 28, 2017 (rather than the January 13, 2018 date provided in Plaintiff's earlier affidavit), the initiation of the investigation still predated Stoner's awareness of the protected activity.

appear to dispute that relocation to Crown Point was an adverse employment action, Defendant must proffer legitimate, non-retaliatory reasons for that action.

Finally, although Weber's decisions to demote Plaintiff and send her to Crown Point were possibly influenced by Stoner and Wiley, Plaintiff does not allege that Weber's alleged failure to provide due process was influenced by any other party.  Because Weber was unaware of the protected activity at all relevant times, Plaintiff cannot connect the causal chain when it comes to her "denial of due process" sub-theory.

B.    **Legitimate, Non-Retaliatory Reasons And Pretext**

Because a reasonable juror could conclude that Plaintiff's protected activity caused Wiley to influence Weber's decision to relocate her to Crown Point, the burden shifts to Defendant to articulate a legitimate, non-retaliatory reason for this action.  *Porter*, 419 F.3d at 894.  If Defendant can do so, Plaintiff bears the ultimate burden of showing that the proffered reason is "merely a pretext for a retaliatory motive."  *Id.*  Because Plaintiff does not separate allegations of pretext from a response to Defendant's proffered legitimate and non-retaliatory reasons, the Court will address them together.

Defendant argues that Crown Point was "contractually appropriate to be filled by" Plaintiff under the MOU between USPS and the APWU, which establishes an "intricate step by step process, also known as a pecking order, to fill craft positions" and further establishes that "craft employees have priority over these positions."  (Doc. 24 at 8.) Defendant also proffers a list of the few out-of-craft positions available for reassignment when the decision was made, which reflects that Crown Point was the closest position. (Doc. 25 ¶ 16; Doc. 27-7 at 2.)

Plaintiff's response is best characterized as a claim of pretext: "[t]he only requirement of placing a qualified person into an open position . . . is that the receiving Postmaster . . . agrees to the employee to be placed in the position, and the losing Postmaster must release the employee."  (Doc. 29 at 9.)  Because Plaintiff was her own Postmaster, only one step was needed, and Plaintiff cites testimony from Postmaster Holyoak, who asserts that she "gladly" would have allowed Plaintiff to fill a position in

Vernon, Arizona.  (Doc. 29-12 ¶ 7.)  Plaintiff also cites testimony from AWPU President Rodriguez, who asserts that Plaintiff's assignment to Crown Point violated her union contract and that Rodriguez "did some checking and was able to determine that there was [sic] at least two open clerk positions available for [Plaintiff] to be assigned that were within the contractual 50 mile radius at the time she was sent to Crown Point."  (Doc. 29-14 ¶ 5.)

Defendant has proffered a legitimate, non-retaliatory reason for assigning Plaintiff to Crown Point: that there is a specific order of priority for most open positions in the USPS that favors craft (*i.e.*, union) employees.  Plaintiff, as a non-craft (*i.e.*, EAS) employee, could not jump the line[10] under the MOU.  (Doc. 25 ¶ 16.)  And Crown Point, which had a clerk position available to the general public, was the closest installation to which Plaintiff could be assigned.  [Doc. 25 ¶ 16; Doc. 27-7 at 2 [listing out-of-craft openings in Alto, NM (339 miles to Holbrook); Littlefield, AZ (373 miles); Douglas, AZ (327 miles); Crown Point, NM (152 miles); and Jal, NM (583 miles).].)

In an effort to show this explanation was pretextual, Plaintiff proffers the Holyoak and Rodriguez declarations, which suggest there were some available clerk positions that were closer to Plaintiff's home.  But neither Holyoak nor Rodriguez appears to have taken into consideration the fact that Plaintiff was a non-craft employee seeking a craft position.  Instead, they refer generally to "open clerk position[s]." (Doc. 29-12 ¶ 7; Doc. 29-14 ¶ 5.)  And although Rodriguez states that Wiley's choice of placement violated Plaintiff's union contract, that is not evidence that Defendant's explanation is pretextual.  Defendant's explanation that Plaintiff could not be submitted for any positions within a 50-mile radius because of the MOU's "pecking order," and Plaintiff's assertion that the union contract prohibited any placements outside a 50-mile radius, are not mutually exclusive.  Thus,

---

[10]     Although it is not clearly explained, the Court's impression is that Plaintiff became a craft employee immediately *upon* her demotion and relocation, bringing with it union representation and line-jumping privileges.  (Doc. 1 ¶ 20 [explaining that after being demoted Plaintiff was "now a clerk [with] the protections given by the Postal Clerks union contract"].)  But when Wiley searched for an open clerk position, Plaintiff was still a non-craft EAS employee who only had access to positions with "insufficient requests from [union] employees who meet the minimum requirements."  (Doc. 27-6 at 3.)

Plaintiff has not met her burden of identifying "specific and substantial" evidence that Defendant's proffered justification for the choice of Crown Point as a relocation destination is unworthy of credence and pretextual. *Coghlan v. Am. Seafoods Co. LLC*., 413 F.3d 1090, 1095 (9th Cir. 2005) ("[T]he plaintiff can make his [circumstantial pretext] case negatively, by showing that the employer's proffered explanation for the adverse action is 'unworthy of credence' . . . . [W]hen the plaintiff relies on circumstantial evidence, that evidence must be 'specific and substantial' to defeat the employer's motion for summary judgment.") (citations omitted).[11]

Furthermore, to survive summary judgment, it would not be enough for Plaintiff to show that Wiley's and Weber's interpretation of the MOU was somehow *wrong* (and Plaintiff has not come close to making such a showing). Instead, Plaintiff would need to go further and show that Defendant's representatives didn't honestly believe the proffered interpretation. *See, e.g.*, *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) ("In judging whether Aloha's proffered justifications were 'false,' it is not important whether they were *objectively* false . . . . Rather, courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless. As the district court correctly observed, Villiarimo presented no evidence that Aloha did not honestly believe its proffered reasons.") (citation and internal quotation marks omitted); *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered. We do not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision.") (citations omitted). Here, there is no suggestion—let alone evidence—that Wiley and Weber lacked an honest belief in their proffered interpretation of the MOU, which dictated that Plaintiff could only be reassigned to Crown Point.

…

---

[11]    Additionally, there is no evidence that Wiley and Weber were aware of Holyoak's willingness to allow Plaintiff to join the Vernon office or of the results of Rodriguez's research (which is only described in vague terms in Rodriguez's declaration).

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Doc. 29) is **granted**.  The Clerk of Court shall enter judgment accordingly and terminate this case.

Dated this 4th day of August, 2022.

_____
Dominic W. Lanza
United States District Judge